664 P.2d 969

STATE of New Mexico,
Plaintiff-Appellee,

v.

Richard Reynaldo GARCIA,
Defendant-Appellant.

No. 14029.

Supreme Court of New Mexico.

Jan. 20, 1983.

Certiorari Denied June 6, 1983.
See 103 S.Ct. 2464.

Michael Dickman, Appellate Defender, Lynne Corr, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

RIORDAN, Justice.

Richard Reynaldo Garcia (Defendant) was convicted of two murders in the first degree for which he received a sentence of life imprisonment and a sentence of death. Defendant appeals. We affirm.

The issues on appeal are:

I. Whether Corrections Officer Louis Jewett's statement was properly introduced into evidence as a dying declaration.

II. Whether references to the "Los Carnales" elicited by the State during testimony and emphasized by the State during closing arguments deprived Defendant of a fair trial.

III. Whether New Mexico's Capital Felony Sentencing Act, Sections 31–20A–1 through 31–20A–6, N.M.S.A.1978 (Repl. Pamp.1981), is unconstitutional because it sanctions cruel and unusual punishment.

IV. Whether the jury instructions used for sentencing were inconsistent and confusing, thereby providing inadequate standards for the jury to decide between the death penalty and life imprisonment.

V. Whether Defendant's sentence of death is excessive and/or disproportionate under the circumstances.

Defendant was convicted of killing Corrections Officer Louis Jewett (Jewett) and inmate Bobby "Barbershop" Carabajal Garcia (Bobby Garcia). On February 26, 1981, at approximately eight o'clock in the evening, Defendant, a southside porter in cellblock three [1], asked Jewett if he could go to the northside of cellblock three to take some books to inmate Jesse Trujillo (Trujillo) [2]. The northside grill was opened for Defendant. The following events lasted only a few minutes. Defendant walked or ran into the northside tier. Trujillo was outside his cell because he was returning from the showers. Bobby Garcia, a northside porter in cellblock three, was out on the main northside tier, talking to another inmate. Jewett was heard yelling, "You guys stop that." A brief commotion ensued among Trujillo, Defendant and Bobby Garcia. Jewett then ran towards the commotion. Bobby Garcia was next seen running towards the officers' station. Bobby Garcia, bleeding, ran through the open grill into the guard station. He was followed by Defendant, Trujillo and Jewett. Trujillo and Defendant were armed with "shanks" [3]. Bobby Garcia ran to the southwest corner of the station and picked up a plastic trash can to try to fend off Trujillo and Defendant, who were both stabbing at Bobby Garcia. Jewett jumped on Trujillo from behind and fastened a "bearhug" on him. At that point, Defendant turned his attention to Jewett and while Jewett was holding on to Trujillo, Defendant stabbed Jewett in his side or lower back. Momentarily, everything came to a standstill. Then, Bobby Garcia ran towards the basement stairs. Jewett continued to struggle as both Trujillo and Defendant stabbed at him. Two officers yelled at Jewett to join them behind the northside grill, but Jewett collapsed. The southside grill was then opened and both Defendant and Trujillo entered with blood on their hands and the

---

1. Cellblock three is the maximum-security area of the New Mexico State Penitentiary. Cellblock three contains cells arranged along three tiers which are composed of the basement, the main floor and the second floor. The tiers of the cellblock are divided into a northside and a southside. Between these two sides, in the middle of the cellblock, is an officers' station. A locked grill separates the officers' station from the northside, another from the southside. These grills and the gates for each cell are controlled within a separately locked cage which is located inside the officers' station.

Except for daily showers and exercise, most of the inmates in cellblock three are locked within their individual cells. However, inmate porters have a relatively high degree of freedom on the tiers because they assist with the cleaning, meals, distribution of linen and other duties.

2. Jesse Trujillo, in a separate trial, was also tried and convicted for the murders of Bobby Carabajal Garcia and Officer Louis Jewett. He received two sentences of life imprisonment. His conviction was affirmed by the New Mexico Supreme Court. *State v. Trujillo,* 99 N.M. 251, 657 P.2d 107 (1982).

3. "Shank" is a prison term for a homemade knife.

shanks that they held. When other officers arrived, Defendant approached the grill and stated to Captain Joe Baca[4], "Baca, we didn't mean to get the officer but he got in the way."

Bobby Garcia and Jewett were taken from the Penitentiary to the hospital. Bobby Garcia died shortly thereafter from multiple stab wounds to his chest and back. Jewett died approximately one month later from the injuries he sustained.

## I. OFFICER JEWETT'S STATEMENT

After the stabbing, Jewett was taken to Saint Vincent Hospital in Santa Fe, New Mexico. He underwent surgery and was taken to the intensive care unit. On March 6, 1981, Jewett was moved to a regular ward because his condition started to show signs of improvement and stability. The attorneys for Defendant and the State were scheduled to take Jewett's deposition on March 26, 1981. However, the deposition was cancelled because Jewett's condition worsened. On April 2, 1981, upon learning that Jewett's health was rapidly deteriorating, an Assistant District Attorney and Officer Ross of the New Mexico State Police, went to the hospital and obtained a statement from Jewett. Jewett died on April 4, 1981.

Jewett's tape recorded statement was later transcribed. In his statement, Jewett stated that he was trying to break up a fight among Defendant, Trujillo and Bobby Garcia. He saw both Defendant and Trujillo with shanks. Both were stabbing at Bobby Garcia. Jewett stated that while he was trying to break up the fight, Defendant stabbed him in the back with a shank.

At oral argument, both attorneys agreed that the recently decided case of *State v. Quintana,* 98 N.M. 17, 644 P.2d 531 (1982), controls this issue of the admissibility of the dying declaration. In *Quintana,* we held that a dying declaration is admissible, when looking at the particular circumstances of a case, if there is a showing that the statement was made under a sense of "impending death".

In the present case, Officer Ross testified that at the time of the interview, Jewett looked pale and thin. During the interview, Jewett was asked, "Did they discuss your chances of improvement?", to which he answered, "Oh, yes, nil." Jewett was again asked, "Mr. Jewett, you understand what your chances of recovery are?", and Jewett answered, "Nil." Therefore, the circumstances surrounding the taking of Jewett's statement and the language in the statement itself, are sufficient to show that Jewett believed his death was imminent.

The admissibility of such evidence is within the sound discretion of the trial court, and its ruling will be upheld unless there is a showing of an abuse of that discretion. *State v. Smith,* 92 N.M. 533, 591 P.2d 664 (1979). We find that there was no abuse of the trial court's discretion in admitting Jewett's statement.

## II. LOS CARNALES

At trial, the State called to the stand cellblock three inmate Danny Macias (Macias). Before the start of Macias's testimony, Defendant made a *motion in limine*[5] to prohibit any mention of "Los Carnales" by Macias during the trial. The trial court denied the motion and allowed the evidence for the purpose of showing motive. During Macias' testimony, Defendant objected to all the testimony concerning "Los Carnales", asserting that such testimony was irrelevant and prejudicial.

Macias testified that Defendant had come by his cell in the early evening of February 26, 1981, and briefly told Macias that he

---

4. Captain Joe Baca is a correctional officer at the New Mexico State Penitentiary. He has been a correctional officer at the Penitentiary for twenty-one (21) years.

5. This *motion in limine* also asked the trial court to preclude mention of Defendant's alleged threats against Lieutenant Mayfield and mention of charges against Defendant for the death of inmate Danny Moraga. The trial court also denied the motion on these points. The trial court's ruling on these two matters are not being contested on appeal.

(Defendant) was going to kill Bobby Garcia. Defendant then came by about ten minutes later and again stated that he was going to kill Bobby Garcia. At this time, Macias asked why, to which Defendant answered, "he [Defendant] was talking to [Bobby Garcia] * * * that he [Defendant] was going to kill Lieutenant Mayfield[6] if Lieutenant Mayfield testified against [him] * * *. He [Bobby Garcia] embarrassed me by saying that I wasn't going to do anything. I am going to show him that 'Los Carnales' are here to stay, we're going to run this place." Macias testified that "Los Carnales" was a gang inside the Penitentiary in which he, Defendant, Trujillo and three others were members. Macias further stated that the gang's purpose was to control the Penitentiary by controlling the inmates and the drug trade within the Penitentiary.

Sam Mascarenas, an alleged member of "Los Carnales" and an inmate in cellblock three, testified as a defense witness. When asked about "Los Carnales", he testified that it was a low-rider's club that he was trying to start in cellblock three for the "guys in population". However, the Penitentiary would not approve the proposed club.

Defendant also testified about this issue when he took the stand. He testified that he was a member of "Los Carnales", a low-rider car club in Albuquerque in 1977, and that he tried to start a low-rider car club in the Penitentiary for the "general population". He stated that his "Los Carnales" tattoo, which indicates membership in the alleged club, was tattooed on him before his incarceration. Defendant further testified that he was acting in self-defense in the stabbing of Bobby Garcia because "[Bobby Garcia] was after him" for not doing some of Bobby Garcia's porter duties.

On rebuttal, the State called cellblock three inmate Nick Sena (Sena). Sena testified that he was a member of "Los Carnales" and that "Los Carnales" was not a car club. He also testified that membership in "Los Carnales" is indicated by a tattoo, which he showed the court.

In closing arguments, the State made reference to "Los Carnales" by stating that Defendant was a member, that the reason Defendant wanted to kill Bobby Garcia was because Bobby Garcia had insulted "Los Carnales", and that the gang was organized to take over the Penitentiary.

On appeal, Defendant claims that the testimony concerning "Los Carnales" was irrelevant and so prejudicial that he was deprived of a fair trial.

N.M.R.Evid. 401, N.M.S.A.1978, states:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Defendant claims that the evidence concerning "Los Carnales" was irrelevant. The trial court allowed the evidence to show motive. There is evidence to support the theory that the reason the stabbing occurred was because Bobby Garcia had insulted Defendant's club, "Los Carnales". Therefore, the evidence was relevant and could properly be admitted under Rule 404(b), N.M.S.A.1978, to show motive.

N.M.R.Evid. 404(b) states:

Evidence of other crimes, wrongs or acts * * * may * * * be admissible for * * * *proof of motive,* opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. [Emphasis added.]

Rule 404(b) allows the admissibility of motive testimony subject to the balancing requirement of N.M.R.Evid. 403, N.M.S.A. 1978. *State v. Lovato,* 91 N.M. 712, 580 P.2d 138 (Ct.App.), *cert. denied,* 91 N.M. 751, 580 P.2d 972 (1978). Rule 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *unfair prejudice,* confusion of the issues or mis-

---

6. The trial referred to in this passage was for the death of inmate Danny Moraga. Richard Reynaldo Garcia was tried and acquitted of the killing of Danny Moraga.

leading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. [Emphasis added.]

 This balancing approach is required of the trial court in determining the admissibility of the evidence. *State v. Lovato, supra.* The fact that competent evidence may tend to prejudice a defendant is not grounds in and of itself for exclusion of that evidence. *State v. Hogervorst,* 90 N.M. 580, 566 P.2d 828 (Ct.App.), *cert. denied,* 90 N.M. 636, 567 P.2d 485 (1977). The trial court must determine whether the probative value of the evidence is outweighed by its prejudicial effect. *Id.* In doing this, the trial court must be sensitive to the potential prejudice that is always inherent in evidence of a defendant's prior wrong acts. *United States v. Lucero,* 601 F.2d 1147 (10th Cir.1979). The trial court has a duty to excise evidence of uncharged acts if it can be done without destroying the relevancy of the evidence which addresses the charges, defenses or issues. *Id.* However, if the evidence is so intertwined, the trial court may allow the evidence. *Id.* In *Lucero,* the defendant was charged with transporting forged securities in interstate commerce. The defendant had come into possession of approximately 900 blank money orders that had been stolen from a bank. Defendant transferred a quantity of the money orders to a Mexican drug dealer in exchange for drugs. The defendant's partners in the transaction had concealed thirteen money orders that were forged and passed directly by the partners. The defendant's charges resulted from these thirteen money orders. At trial, evidence of the Mexican drug transaction was allowed. On appeal, defendant claimed that the tape recorded evidence admitted at trial concerning the drug transaction was prejudicial because it referred to an unrelated crime. The appellate court agreed with the trial court's determination that because the drug transaction was so intertwined with the money order discussion, the evidence could not have been reasonably excised.

The trial court allowed the testimony concerning "Los Carnales" to show motive. The evidence concerning "Los Carnales" is so intertwined with a possible motive of Bobby Garcia's death that the trial court could not have excised it. The trial court has the discretion to admit or exclude evidence. *State v. Day,* 91 N.M. 570, 577 P.2d 878 (Ct.App.), *cert. denied,* 91 N.M. 491, 576 P.2d 297 (1978). We will not set aside the decision of the trial court unless there was a clear abuse of that discretion. *Id.* We find that the trial court did not abuse its discretion in allowing this testimony.

## III. DEATH PENALTY

Defendant contends that the death penalty constitutes cruel and unusual punishment under the United States' and New Mexico's Constitutions. U.S. Const. amends. VIII and XIV; N.M. Const., Art. II, § 13.[7]

In the landmark decision of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court discussed the death penalty. The issue before the Court was whether the death penalty in the cases[8] before the Court, constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The opinion held that the carrying out of the death penalty in these particular cases did constitute cruel and unusual punishment. Each Justice wrote a separate opinion. Four of the Justices held that capital punishment is not unconstitutional *per se;* three Justices,

7. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), held that the Eighth Amendment to the United States Constitution was applicable to the states through the Fourteenth Amendment to the United States Constitution.

8. The death penalty cases combined by the United States Supreme Court in *Furman v.*

*Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), were 1) Petitioner was convicted of rape in Georgia and sentenced to death, 2) Petitioner was convicted of murder in Georgia and sentenced to death, and 3) Petitioner was convicted of rape in Texas and sentenced to death.

while agreeing that the particular state statutes in *Furman* were invalid as applied, left open the question of whether capital punishment may be imposed; and the other two Justices felt that the death penalty violated the Eighth Amendment.

■ In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court again addressed the death penalty question and held that "the punishment of death does not invariably violate the Constitution." *Id.* at 169, 96 S.Ct. at 2923. That same year in *State of New Mexico ex rel. Serna v. Hodges,* 89 N.M. 351, 552 P.2d 787, *overruled on different grounds,* 89 N.M. 408, 553 P.2d 688 (1976) and *State v. Rondeau,* 89 N.M. 408, 553 P.2d 688 (1976), we held that the death penalty is not cruel and unusual punishment *per se* within the prohibition of the Eighth and Fourteenth Amendments of United States Constitution or Article II, Section 13 of the New Mexico Constitution. However, in *State v. Rondeau, supra,* we held that New Mexico's capital punishment statute was unconstitutional because the statute imposed a mandatory death sentence. The United States Supreme Court in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), held that mandatory death sentences which leave neither the judge nor the jury discretion to impose a lesser sentence, violated the Eighth Amendment prohibition against cruel and unusual punishment. Therefore, we continue to hold that the death penalty, in and of itself, does not violate the United States' or New Mexico's Constitutions as cruel and unusual punishment.

■ We next look at the constitutionality of New Mexico's current capital punishment statutes. §§ 31–20A–1 through 31–20A–6. These statutes were modeled after similar statutes in Florida, Georgia and Texas. Fla.Stat. § 921.141 (1981); Ga.Code Ann. § 27–2534.1 and § 27–2537 (Cum.

Supp.1982); Texas Stat.Ann. art. 37.071 (Vernon 1981).[9] These states' statutes have withstood constitutional scrutiny by the United States Supreme Court. *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia, supra; Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). These states' statutes generally provide for, as ours does:

1) a bifurcated hearing wherein the death penalty is considered separately, after a guilty verdict has been rendered in a capital felony case [Section 31–20A–1];

2) a consideration of aggravating and mitigating circumstances concerning the murder [Section 31–20A–2]; and,

3) an automatic and complete appellate review of any case involving the death penalty [Section 31–20A–4].

Therefore, we uphold the constitutionality of New Mexico's current capital punishment statutes.

## IV. JURY INSTRUCTIONS

The jury was given N.M.U.J.I.Crim. 39.31 and 39.33, N.M.S.A.1978 (Repl.Pamp.1982). U.J.I.Crim. 39.31, states:

The law provides that you cannot sentence the defendant to death unless you are satisfied beyond a reasonable doubt that the murder was committed under one or more of the aggravating circumstances charged. The burden is always on the state to prove beyond a reasonable doubt that the murder was committed under one or more of the aggravating circumstances charged and that the mitigating circumstances do not outweigh the aggravating circumstances.

It is not required that the state prove this beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense—a kind of doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life.

9. Silver, *Constitutionality of the New Mexico Capital Punishment Statute,* 11 N.M.L.Rev. 269 (1981).

The pertinent part of U.J.I.Crim. 39.33, states:

> If you have unanimously agreed on a finding that [the aggravating circumstance charged was] [one or more of the aggravating circumstances charged were] [Footnote omitted.] present, you must then consider the penalty to be imposed in this case. In determining the penalty to be imposed you must consider all of the evidence admitted during this proceeding and the evidence admitted during trial in which the defendant was found guilty of murder. You must then consider whether there are any mitigating circumstances.
>
> If you find there are mitigating circumstances, you must then weigh the mitigating circumstances against the [aggravating circumstance] [one or more aggravating circumstances] [Footnote omitted.] you have found in this case. After weighing the aggravating circumstances and the mitigating circumstances, weighing them against each other, and considering both the defendant and the crime, you shall determine whether the defendant should be sentenced to death or life imprisonment.
>
> If you fail to unanimously agree that the death penalty should be imposed, a penalty of life imprisonment will be imposed by the court.

■ Under U.J.I.Crim. 39.31, the jury is required to make two determinations: *first,* whether the State has proved beyond a reasonable doubt that the murder was committed under the aggravating circumstance(s) [10] as charged, and *second,* whether the mitigating circumstances do not outweigh the aggravating circumstance(s). Once these two determinations are made, the jury is further instructed under U.J.I. Crim. 39.33, that they must weigh the aggravating circumstance(s) and mitigating circumstances and consider the defendant and the crime charged in making a determination of a sentence of either death or life imprisonment. Defendant claims that the jury instructions are in conflict with each other because U.J.I.Crim. 39.31 requires proof that the aggravating circumstance(s) are not outweighed by the mitigating circumstances and U.J.I.Crim. 39.33 requires a weighing of the aggravating circumstance(s) and mitigating circumstances against each other. The jury was instructed at the trial and sentencing stage to consider the jury instructions as a whole and not to pick out parts of one instruction and disregard others. N.M.U.J.I.Crim. 39.-42, N.M.S.A.1978 (Repl.Pamp.1982). These instructions clearly require the jury, in weighing the aggravating circumstance(s) against the mitigating circumstances, to find that the aggravating circumstance(s) outweight the mitigating circumstances before the penalty of death can be imposed.

■ Defendant also argues that U.J.I. Crim. 39.33 does not provide "clear and objective standards" which are "rationally reviewable". In *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980), the United States Supreme Court stated that a sentencer's discretion must be channeled by " 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.' " However, this case dealt with Georgia's then aggravated circumstance statute in which a person convicted of murder could have been sentenced to death if it was found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Id.* at 422, 100 S.Ct. at 1762. The Court stated that this was too vague a description

---

**10.** The aggravated circumstance to be considered in Richard Reynaldo Garcia's case is that "while incarcerated in a penal institution in New Mexico, the defendant, with the intent to kill, murdered an employee of the corrections and criminal rehabilitation department [correction department]." § 31–20A–5(E),

N.M.S.A.1978 (Repl.Pamp.1981). At the time of Bobby Carabajal Garcia's death, Section 31–20A–5(D), N.M.S.A.1978 (Repl.Pamp.1981), had not been enacted. Section 31–20A–5(D) includes the murdering of a prisoner as an aggravated circumstance.

for an aggravated circumstance because any person could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman." The Court stated that it will not permit a subsection of an aggravated circumstance statute to simply become a "catchall" for cases which do not fit within any of the other subsections. However, this is not the case with New Mexico's aggravated circumstance statute. Section 31–20A–5 specifically lists the aggravated circumstances that allow for the death penalty.

■ We can find *no* United States Supreme Court case which states that mitigating circumstances must be specified in a "clear and objective standard". On the contrary, the United States Supreme Court has held that in a sentencing proceeding, a jury or judge must take into account the characteristics of the person as well as the circumstances of the offenses. *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Individual consideration must be given in a death sentencing proceeding. Therefore, a *subjective standard* must be used for this review. We find no fault with these jury instructions.

■ Defendant did not object to these jury instructions at the time of trial. He raises this objection for the first time on appeal. We have repeatedly held that objections to jury instructions cannot be raised for the first time on appeal when the defendant did not object to the instructions at trial. *State v. Noble,* 90 N.M. 360, 563 P.2d 1153 (1977); *State v. Rodriguez,* 81 N.M. 503, 469 P.2d 148 (1970). Florida has recently ruled on this issue when a death sentence is involved. In *Vaught v. State,* 410 So.2d 147 (Fla.1982), the defendant argued that the court failed to provide the jury with complete instructions on aggravating and mitigating circumstances. The Florida Supreme Court held that "[s]ince [defendant] made no objection to the instructions below, this point may not be raised on appeal." *Id.* at 150. Also, the United States Supreme Court in a habeas

corpus proceeding, has held that a defendant's failure to object to jury instructions precludes a challenge to the constitutionality of those instructions in a federal habeas proceeding. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

Defendant, however, claims that these jury instructions can be attacked for the first time on appeal because of fundamental error pursuant to N.M.R.Crim.App. 308(b), N.M.S.A.1978 and Section 31–20A–4(B). New Mexico's Rules of Evidence do not provide a different standard for admission of evidence or review of error simply because the possible punishment is death. Therefore, we continue to hold that objections to jury instructions *cannot* be raised for the first time on appeal.

## V. PROPORTIONALITY REVIEW

Defendant argues that his sentence of death was "excessive and/or disproportionate" in comparison to the similar crime of Trujillo who received a sentence of life imprisonment.

The Capital Felony Sentencing Act, Section 31–20A–4(B) and the pertinent part of (C), states:

B. In addition to the other matters on appeal, the supreme court shall rule on the validity of the death sentence.

C. The death penalty shall not be imposed if:

* * * * * *

(4) the sentence of death is excessive or disproportionate to the penalty imposed in *similar cases,* considering both *the crime and the defendant.* [Emphasis added.]

■ This Section represents an act of the Legislature which we are required to interpret in accordance with sound rules of statutory construction. Section 31–20A–4(B) states that only this Court can decide if a sentence of death is excessive or disproportionate. In Section 31–20A–4(C), the Legislature directs this Court to review the death sentence to see if "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, consider-

ing both the crime and the defendant". We assume that the Legislature means that in similar cases, considering both the crime and defendant, a defendant convicted of first degree murder under a specific aggravated circumstance should not be put to death if another defendant or other defendants, convicted of murder under the same aggravated circumstance is given life imprisonment, unless there is some justification. Therefore, we adopt the following guidelines for review under this Section.

1. We will review this issue only when raised on appeal.

2. In our review, we will consider only New Mexico cases in which a defendant has been convicted of capital murder under the *same aggravating circumstance(s)*.[11]

3. Only those New Mexico cases in which a defendant was convicted under the same aggravating circumstance(s) and then received *either* the death penalty *or* life imprisonment and whose conviction and sentence have been upheld previously by this Court, will be considered appropriate for comparison.

4. We will review the record and compare the facts of the offense and all other evidence presented by way of aggravation or mitigation to determine whether the sentence is excessive or disproportionate.

 In adopting these guidelines, we have reviewed the United States Supreme Court opinions that have discussed the issue of proportionality. *Gregg v. Georgia, supra,* which first upheld the constitutionality of the death penalty, addressed the issue of excessiveness of the punishment in relation to the death penalty. Under *Gregg,* a review of the punishment in the abstract, rather than in the particular, is to be considered when inquiring into excessiveness. Two aspects must be considered in deter-

mining whether a punishment is excessive and unconstitutional.[12] *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977), stated the requirements of *Gregg* as follows:

(1) [The punishment] makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or

(2) [the punishment] is grossly out of proportion to the severity of the crime.

When reviewing a sentence under this test, the Court pointed out that a judgment under such a review should not be, or appear to be, merely the subjective views of an individual Justice; rather, the Justices have a duty to review the case on an objective level. *Coker v. Georgia, supra.* Whatever our own personal beliefs may be, the government of the States of the Union are, "government[s] of laws, and not of men." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). Attention must also be given to the public attitudes concerning a particular sentence and to its history, precedent, legislative attitudes and the responses of the jurors. *Coker v. Georgia, supra. Gregg* did such an analysis in determining that the death penalty for a deliberate murder was neither a purposeless imposition of a severe punishment nor grossly disproportionate for the crime.

The United States Supreme Court in *Gregg* found that the imposition of the death penalty for the crime of murder had a long history of acceptance in the United States and England. At the time the Eighth Amendment was ratified, capital punishment was a common sanction in every state. The United States Supreme Court repeatedly has recognized the appropriateness of the death penalty. *Trop v. Dulles,* 356 U.S. 86, 99, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958) (Chief Justice Warren

---

11. It is the duty of the defendant's attorney to supply the Court with information of similar cases. Such information is of public record. §§ 14–3–1 through 14–3–25, N.M.S.A.1978 (Orig. and Cum.Supp.1982).

12. The cruel and unusual punishment clause of the Eighth Amendment is directed, in part, against all punishments which by their excessive length or severity are greatly disproportionate to the offenses charged. *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

wrote "the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty."); *Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947); *In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *Wilkerson v. Utah,* 9 U.S. 130, 25 L.Ed. 345 (1878). Finally, the legislatures of at least thirty-five (35) states have enacted statutes which provide for the death penalty in at least some crimes that result in the death of another person. *Gregg v. Georgia, supra,* 428 U.S. at 179–80, 96 S.Ct. at 2928. Therefore, the United States Supreme Court concluded that the death penalty for a deliberate murder is neither the purposeless imposition of severe punishment nor punishment grossly disproportionate for the crime. *Gregg v. Georgia, supra.*

The United States Supreme Court has avoided imposing or suggesting a method or model for state appellate review of proportionality. *State v. Copeland,* S.C., 300 S.E. 63 (1982). This is obvious from the fact that the Texas statute, scrutinized in *Jurek v. Texas, supra,* provided for no proportionality review. Also, in neither *Gregg v. Georgia, supra,* nor *Proffitt v. Florida, supra,* was there any language elevating proportionality review to constitutional prominence. *State v. Copeland, supra.* Therefore, the Court has left proportionate review to the individual states. *Id.*

The Court, however, appears to look at the ultimate result when deciding whether a petitioner's punishment is excessive or disproportionate. For example, the Court has found that the death penalty is excessive when such punishment is applied to a conviction for rape. *Coker v. Georgia, supra.* Also, the death penalty is excessive when applied to an accomplice who aids and abets in a felony, where in the course of that felony a murder is committed by others than the accomplice, and the accomplice himself did not kill, attempt to kill, intend that the killing take place or know that lethal force would be employed. *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

We find that Defendant's sentence of death for the deliberate murder of Jewett is neither excessive nor disproportionate. We have *thoroughly* reviewed the record and transcripts of Defendant's trial. Defendant ignores the evidence when he asserts that his situation is "similar" to Trujillo's, when claiming that his sentence is disproportionate. The evidence shows that the fight resulting in Jewett's death was started either because Defendant's pride was hurt or because Defendant would not do Bobby Garcia's porter duties. While Jewett had Trujillo in a "bearhug", Defendant turned his attentions from his attack on Bobby Garcia and intentionally and unmercifully stabbed Jewett from behind. Although Defendant and Trujillo were tried for the same crime, the evidence does differ as to the actions of each during the crime.

Proportionality *review* in New Mexico is first and foremost directed to the particular circumstances of a crime and the specific character of the defendant. In our duty to *review* the determination by the jury, we will not retry the case for what may be a better result.

## VI. CONCLUSION

After having carefully reviewed the record and transcript in the case before us, we conclude that there was no error committed on the issues before us in this case and that the death sentence was validly imposed. Therefore, the judgment of the jury that Defendant be punished by death is affirmed. This case is remanded to the trial court to set the date of execution.

IT IS SO ORDERED.

PAYNE, C.J., and FEDERICI and STOWERS, JJ., concur.

SOSA, Senior Justice, specially concurring on all issues except the issue of the imposition of death.

SOSA, Senior Justice, specially concurring.

I concur with the majority opinion except as to the imposition of the death penalty.

While I do not believe that the death penalty in and of itself is unconstitutional as cruel and unusual punishment, I would hold that New Mexico's Capital Felony Sentencing Act, Sections 31–20A–1 through 31–20A–6, N.M.S.A.1978 (Repl.Pamp.1981), is unconstitutional under the U.S. Const. amends. VIII and XIV and the N.M. Const., Art. II, §§ 13 and 18, for the following reasons: (1) the Uniform Jury Instructions used at sentencing are inconsistent, confusing and provide inadequate standards for the final decision between death and life imprisonment in that (a) "mitigating circumstance" is not defined, (b) the jury is not required to make a written statement that it has considered a particular mitigating circumstance, and (c) no standard is provided by which the jury may determine whether aggravating circumstances outweigh mitigating circumstances; (2) the statute does not provide a procedure for meaningful appellate review of either the sentencing decision or proportionality; and (3) the death penalty does not fall equally on all but, instead, New Mexico's statute and Uniform Jury Instructions allow for different treatment of equally culpable individuals.

## I

The Uniform Jury Instructions used at sentencing, N.M.U.J.I.Crim. 39.10 through 39.34, N.M.S.A.1978 (Repl.Pamp.1982), and the death penalty statute, §§ 31–20A–1 through 31–20A–6, are inconsistent, confusing and provide inadequate standards for the final decision between death and life imprisonment.

The jury instructions relevant to this case are as follows:

The law provides that you cannot sentence the defendant to death unless you are satisfied beyond a reasonable doubt that the murder was committed under one or more of the aggravating circumstances charged. The burden is always on the state to prove beyond a reasonable doubt that the murder was committed under one or more of the aggravating circumstances charged and that the mitigating circumstances do not outweigh the aggravating circumstances.

It is not required that the state prove this beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life.

N.M.U.J.I.Crim. 39.31.

If you have unanimously agreed on a finding that one or more of the aggravating circumstances charged were present, you must then consider the penalty to be imposed in this case. In determining the penalty to be imposed, you must consider all of the evidence admitted during this sentencing proceeding and the evidence admitted during the trial in which the defendant was found guilty of murder. You must then consider whether there are any mitigating circumstances.

If you find there are mitigating circumstances, you must then weigh the mitigating circumstances against the one or more aggravating circumstances you have found in this case. After weighing the aggravating circumstances and the mitigating circumstances, weighing them against each other, and considering both the defendant and the crime, you shall determine whether the defendant should be sentenced to death or life imprisonment.

N.M.U.J.I.Crim. 39.33.

The jury is required to complete a verdict form, N.M.U.J.I.Crim. 39.34, specifying which aggravating circumstance they have found. However, the jury is not required to state which mitigating circumstances they have considered nor are they required to state whether they have found that the mitigating circumstances do or do not outweigh the aggravating circumstances.

The basic requisite of a constitutionally valid capital sentencing procedure is that it must provide "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson v. North Carolina,* 428

U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976); *see Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The United States Supreme Court has said that

> *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

*Gregg, supra,* 428 U.S. at 189, 96 S.Ct. at 2932. New Mexico's death penalty sentencing procedure does not meet these requirements.

The term "mitigating circumstance" is not defined by the death penalty statute or jury instructions. Indeed, the verdict form, N.M.U.J.I.Crim. 39.34, neither mentions mitigating circumstances nor requires any finding with respect to them. This exacerbates the problems inherent in N.M.U.J.I. 39.33 which gives the jury no guidance as to the meaning of "considering both the defendant and the crime." The only aggravating circumstances which a jury may consider are those specifically listed in the statute. § 31–20A–5. Thus, the defendant and the crime may not be considered as an aggravating circumstance but *only* in mitigation. The jury obviously should be instructed to this effect. Failure to so instruct the jury would allow them to consider the defendant and the crime in aggravation and would allow a juror to use his unfettered bias or prejudice against a defendant of a different ethnic or racial group.

N.M.U.J.I.Crim. 39.31 requires a finding of the negative proposition that "the mitigating circumstances do not outweigh the aggravating circumstances." An instruction to find a negative proposition is often confusing to a jury. The use of confusing instructions constitutes reversible error. *See State v. Wise,* 95 N.M. 265, 620 P.2d 1290 (1980).

N.M.U.J.I.Crim. 39.31 and 39.33 do not provide the jury with guidance as to the standard to use in weighing aggravating circumstances against mitigating circumstances. For example, the jury has no way of knowing whether their weighing should be by a preponderance of the evidence or beyond a reasonable doubt. The jury is given no guidance in the event that the aggravating circumstances are equally balanced with the mitigating circumstances. Both the aggravating circumstances, which are necessary to support a death sentence in New Mexico, and the mitigating circumstances, which may mitigate against imposition of the death sentence, involve factual findings that are not required to be made and are not made at the guilt phase of the trial. Therefore, the sentencing statute requires that aggravating circumstances be found beyond a reasonable doubt. § 31–20A–3. Similarly, there should be some standard for a finding that aggravating circumstances outweigh mitigating circumstances.

Due process requires reasonably clear guidelines for triers of fact in order to prevent arbitrary and discriminatory enforcement. *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Due process protections are demanded where a new finding of facts must be made in order to support a particular sentencing outcome. *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). The sentencing process, as well as the trial, must satisfy the Due Process Clause. *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion). Traditional due process standards forbid the imposition of sanctions under any procedure which "licenses the jury to create its own standard in each case." *Herndon v. Lowry,* 301 U.S. 242, 263, 57 S.Ct. 732, 741, 81 L.Ed. 1066 (1937); *Giaccio v. Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). Because New Mexico's statute and jury instructions fail to provide *any* standard, they are susceptible of improper application and are therefore unconstitutional.

A jury must be carefully and adequately guided in its deliberations. *Gregg, supra,* 428 U.S. at 193, 96 S.Ct. at 2934. Several states have given such direction to jurors in their death penalty statutes. Arkansas, North Carolina, Ohio and Washington require jury findings that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Ark.Stat.Ann. § 41–1302(1)(b) (1977); N.C. Gen.Stat. § 15A–2000(c)(3) (Supp.1981); Ohio Rev.Code Ann. § 2929.03(D)(2) and (3) (Page 1981); Wash.Rev.Code Ann. 10.95.-060(4) (1981). Connecticut prohibits the death sentence in any case where there exist any mitigating circumstances. Conn. Gen.Stat. § 53a–46a(e) and (f) (1981).

The use of confusing and inadequate instructions constitutes reversible error. *See State v. Wise, supra; State v. DeSantos,* 89 N.M. 458, 553 P.2d 1265 (1976); *State v. Buhr,* 82 N.M. 371, 482 P.2d 74 (Ct.App. 1971). The majority opinion is correct in that a defendant who neither objects to instructions given nor tenders his own waives his right to object for the first time on appeal. *State v. Noble,* 90 N.M. 360, 563 P.2d 1153 (1977). However, where a fundamental right of the accused has been violated, this Court may, in its discretion, see that injustice is not done. *State v. Garcia,* 19 N.M. 414, 143 P. 1012, *reh'g granted,* 19 N.M. 420, 143 P. 1014 (1914); *State v. Garcia,* 46 N.M. 302, 128 P.2d 459 (1942). The defendant's rights to due process under the Fourteenth and Eighth Amendments are clearly fundamental where the outcome of a violation of his rights is that defendant is sentenced to die. New Mexico's statute and instructions fail to provide even the minimal guidance required. Accordingly, the sentence of death should be reversed in this case and the defendant sentenced to life in prison.

## II

New Mexico's death penalty statute does not include procedures for the development of a record by which this Court may ascertain if a jury has imposed a death penalty on arbitrary or capricious grounds or under the influence of passion or prejudice. Nor does the statute provide for a record by which to determine if the evidence supports a finding that the mitigating circumstances do not outweigh the aggravating circumstances. No procedure is provided by which this Court may review whether a death sentence is excessive or disproportionate to penalties imposed in similar circumstances, considering both the defendant and the crime. Thus, this Court is precluded from properly reviewing the jury's sentencing verdict.

This jurisdiction's doctrine of fundamental error, which encompasses within it any error that deprives an accused of a fundamental right, allows the assertion of the denial of a defendant's right to due process to be raised for the first time on appeal to see that justice is done. *State v. Garcia,* 19 N.M. 414, 143 P. 1012, *reh'g granted,* 19 N.M. 420, 143 P. 1014 (1914); *State v. Garcia,* 46 N.M. 302, 128 P.2d 459 (1942). Therefore, Mr. Garcia may raise the issue of reviewability on appeal.

Section 31–20A–4 requires this Court to review every sentence of death.

A. The judgment of conviction and sentence of death shall be automatically reviewed by the supreme court of the state of New Mexico.

B. In addition to the other matters on appeal, the supreme court shall rule on the validity of the death sentence.

C. The death penalty shall not be imposed if:

(1) the evidence does not support the finding of a statutory aggravating circumstance;

(2) the evidence supports a finding that the mitigating circumstances outweigh the aggravating circumstances;

(3) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; or

(4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

§ 31–20A–4(C).

Because the jury is given no standard by which to weigh the evidence at sentencing,

this Court is denied any means for proper review of the sentencing verdict and is unable to determine if such a verdict is arbitrary or capricious.

The laws of Georgia, Florida and Texas, which have been approved by the United States Supreme Court, *Gregg, supra; Proffitt, supra; Jurek, supra,* require the finding of at least one aggravating circumstance beyond a reasonable doubt to support a sentence of death. However, unlike New Mexico, these three states require written findings. Silver, *Constitutionality of the New Mexico Capital Punishment Statute,* 11 N.M.L.Rev. 269 (1981). The United States Supreme Court has never discussed the potential for incomplete appellate review because of inadequate written findings. *Id.* I believe that meaningful appellate review of a death penalty sentence is not possible without such written findings.

In *Gregg, supra,* the United States Supreme Court relied on Georgia's appellate review of individualized death sentences in rejecting the defendant's contention that the Constitution's ban on cruel and unusual punishments barred the imposition of the death penalty under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.

> Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.

*Id.* 428 U.S. at 195, 96 S.Ct. at 2935. New Mexico's statute lacks procedures for making comparisons between cases. What kinds of cases are we to consider? What does similar mean? How far back in New Mexico's judicial history should comparisons be made? Should extrajudicial cases be brought into the analysis? Are cases which ended in plea bargains relevant? If a prosecutor exercises discretion in the charging process and seeks an indictment without aggravating circumstances, is that case sim-

ilar? Is the record for review of proportionality to be established in the trial court? If the record for review is to be developed at the appellate level, are evidentiary hearings required? The language is, at best, susceptible of many different interpretations. Due process demands proportionality review, *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion), and the Legislature apparently intended to comply with the requirement. However, this section is so vague that an accused is not accorded meaningful appellate review. I disagree with the guidelines for review of proportionality set forth in the majority opinion. This Court is statutorily mandated to review this issue whether it is raised on appeal or not. In addition, I believe that cases in which the death sentence is imposed should be compared to cases in which the defendant is *charged* with a capital offense under the same aggravating circumstances. Comparison should also be made to cases in which the defendant was charged with a capital offense but which, for whatever reason, were not appealed to this Court.

In *Proffitt, supra,* the Court found that Florida's failure to formulate a rigid objective test as a standard of review did not necessarily render the appellate review process ineffective or arbitrary because the Florida court performed its function of death sentence review with a maximum of rationality and consistency. It cannot be said that this Court's review of Garcia's sentence is consistent with its review of Trujillo's sentence. *See State v. Trujillo,* 99 N.M. 251, 657 P.2d 107 (1982). The difference in the evidence presented in the two cases is not significant enough to justify one defendant being sentenced to death and the other to life imprisonment. It is impossible to determine from the record who struck the blow that resulted in Officer Jewett's death.

It is interesting to note that the majority changed their opinion subsequent to my circulating a dissent calling attention to their failure to adopt guidelines for review of proportionality. Even though guidelines

have now been set out, they still do not allow for a meaningful appellate review for the reasons I have set forth above. For the foregoing reasons, I believe that the Capital Felony Sentencing Act as a whole must fail as being in violation of the rights accorded by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and analogous provisions of the New Mexico Constitution. It is my judgment that we cannot impose the death penalty until we have set up some procedure so that a meaningful appellate review for proportionality can be had in accordance with § 31–20A–4(C).

### III

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner, supra,* 430 U.S. at 358, 97 S.Ct. at 1204. New Mexico's death penalty statute does not apply equally to all but allows for different treatment of equally culpable individuals. The arbitrary and capricious nature of this penalty has not been rectified by New Mexico's sentencing procedures. Without guidelines for the jury to follow and without an appropriate procedure for meaningful appellate review, this Court is unable to determine whether the jury has acted capriciously and is also unable to examine similar cases for proportionality. Under such vague language as is found in the New Mexico statute, the following problem arises:

> [T]he jury, on no grounds or on any grounds, articulated or not articulated, can spare any defendant's life either by refusing to sentence to death though "aggravating circumstances" be found, or as is more likely, simply failing, whatever the evidence, to find aggravating circumstances—both being unreviewable actions. The strictly logical corollary is that the jury may, within the same field of death eligibles, fail to spare some others, and need give no reason for the difference. Arbitrary lenience equals arbitrary harshness, by an iron law of sheer identity.

Black, *Caprice and Racism in the Death Penalty,* in Final Report Annual Chief Justice Earl Warren Conference on Advocacy in the United States 21, 30 (1980). This is precisely the problem which has arisen under the facts of the Garcia case. Garcia and Trujillo were jointly indicted but, because of severance, they were separately convicted of the murder of Officer Jewett. In *Trujillo, supra,* the jury spared Trujillo's life by refusing to find the aggravating circumstance that while incarcerated in a penal institution in New Mexico, the defendant, with the intent to kill, murdered an employee of the corrections and criminal rehabilitation department. In this case, the jury found the same aggravating circumstance. If these cases had remained unsevered, the jury could not have made this inconsistent finding. Without this inconsistency, they both would have been given life or they both would have been given death. One cannot meaningfully distinguish the *Trujillo* case, in which the death sentence was not imposed, from the Garcia case, in which the death sentence was imposed.

We don't know why the *Trujillo* jury failed to find the aggravating circumstance. The jury may have been confused by the instructions or may have meant to find that the mitigating circumstances did outweigh the aggravating circumstances. A comparison of the *Trujillo* case with the instant case strongly illustrates that New Mexico's statute and jury instructions are inconsistent and confusing, that this Court cannot meaningfully review such death sentences, and that the statute and jury instructions are fraught with the potential for different treatment of equally culpable individuals.

### CONCLUSION

New Mexico's death penalty statute and jury instructions violate both the United States Constitution and the Constitution of the State of New Mexico. They are confusing, vague and fail to provide adequate, objective standards to guide the jury in its decision between death and life imprison-

ment. No procedure exists whereby this Court can meaningfully review the jury's decision. This Court does not have an adequate objective procedure to review capital felony cases for proportionality, nor does its review of this case meet the consistency requirement established in *Proffitt, supra.* Because the jury is inadequately instructed and because of the lack of reviewability, there is a great potential for different treatment of equally culpable defendants. Death cannot constitutionally result from such a process.

For the foregoing reasons, I respectfully dissent as to the imposition of the death sentence. I would hold that New Mexico's death penalty statute is unconstitutional and remand this case for the imposition of a sentence of life imprisonment.