641 P.2d 1087

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Modesto MARTINEZ,
Defendant-Appellant.**

**No. 5105.**

Court of Appeals of New Mexico.

Feb. 2, 1982.
Writ of Certiorari Denied Feb. 26, 1982.

John B. Bigelow, Chief Public Defender, Michael Dickman, Appellate Defender, Martha Vasquez, Asst. Public Defender, Trial Counsel, Santa Fe, Paul Kennedy, Trial Counsel, Albuquerque, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WOOD, Judge.

Defendant appeals his convictions of voluntary manslaughter, false imprisonment and aggravated assault on a peace officer. We (1) caution counsel; (2) discuss volun-

tary manslaughter; and (3) discuss the alleged prejudice to defendant from security personnel.

*Caution Counsel*

 Defendant filed 49 written pretrial motions, including 2 motions to extend the time for filing pretrial motions, and 4 motions for continuance. The docketing statement lists 31 appellate issues. The number of pretrial motions and the number of issues in the docketing statement raise a question of unwarranted claims. Inasmuch as all but two issues in the docketing statement were abandoned, because not briefed, see *State v. Brown*, 95 N.M. 3, 617 P.2d 1324 (Ct.App.1980), we do no more, in this case, than remind trial counsel of their obligation to comply with the Code of Professional Responsibility, Rule 7–102(A), Judicial Pamphlet 11, N.M.S.A.1978. Public defenders, paid with public funds, are not excused from compliance with the Code.

*Voluntary Manslaughter*

It is not disputed that defendant shot and killed State Police Officer Gomez. Defendant claims the evidence is insufficient to sustain his conviction of voluntary manslaughter. Defendant seems to argue that if he committed any homicide, his crime was not voluntary manslaughter, and because the jury acquitted defendant of murder, he committed no crime by killing Gomez. See *Smith v. State*, 89 N.M. 770, 558 P.2d 39 (1976). Defendant's specific argument is that the evidence does not show the provocation necessary for voluntary manslaughter, see *Smith v. State*, supra.

 The crime of voluntary manslaughter requires "sufficient provocation" which can be "any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions." U.J.I.Crim. 2.22, N.M.S.A.1978 (1981 Cum.Supp.). *Smith v. State*, supra, characterizes this as a killing upon a sudden quarrel or in the heat of passion. *State v. Garcia*, 95 N.M. 260, 620 P.2d 1285 (1980), states the provocation "must be continuing and to such an extent that an ordinary person would not have cooled off before

acting." However, because Gomez was a police officer, his actions "exercising his duties in a lawful manner cannot rise to the level of sufficient provocation." *State v. Manus*, 93 N.M. 95, 597 P.2d 280 (1979). There must be evidence that Gomez's actions were not in the exercise of his duties in a lawful manner.

There is evidence that, at different times prior to the shooting, there had been difficulties between defendant and Gomez which caused defendant to fear Gomez. This evidence is that Gomez had accused defendant of stealing cattle; that only a few weeks prior to the shooting, Gomez asked defendant if he was "still stealing" cattle; that in 1977 Gomez pulled his shotgun on defendant's son; that Gomez had fired his gun over the ear of the son of defendant's cousin; that upon arresting and transporting defendant's brother to jail, Gomez had berated the brother; that Gomez had hit the defendant; that within an hour before the shooting, Gomez told defendant he was going to take defendant to jail just as he had taken defendant's brother to jail.

The shooting occurred at the side of the road. Gomez used his emergency flashers to cause defendant to stop his truck. There is evidence that Gomez ordered defendant out of the truck; that when defendant refused, Gomez, angry, opened the door, grabbed defendant by the shirt and pulled him out of the truck and pushed defendant against the truck. As Gomez was looking at a passing car, defendant reached into his truck and grabbed his pistol. Fearing Gomez would draw his gun, defendant backed around his truck followed by Gomez. Defendant told Gomez not to move when Gomez made a gesture which defendant interpreted as either a movement by Gomez toward defendant or for his gun. At a point when defendant could not see Gomez's hands, Gomez made a move which alarmed defendant, and defendant fired his gun. There is evidence that defendant was angry at being stopped and became more angry during the roadside incident.

The foregoing evidence was sufficient to raise a jury issue as to voluntary manslaughter and is sufficient to sustain the conviction for voluntary manslaughter. *State v. Martinez*, 95 N.M. 421, 622 P.2d 1041 (1981); *State v. Benavidez*, 94 N.M. 706, 616 P.2d 419 (1980); *State v. Montano*, 95 N.M. 233, 620 P.2d 887 (Ct.App.1980).

*Prejudice from*

*Security Personnel*

Defendant states:

This case was tried in the Tierra Amarilla courthouse. It was tried under conditions of tight, visible security, provided in large measure by the New Mexico State Police. The doors and interior of the courtroom were guarded by uniformed officers; spectators were questioned as they entered; jurors were escorted to and from the proceedings and watched over during deliberations. Throughout trial, defendant objected to these security arrangements. Defendant felt that the security was prejudicial, and that the use of uniformed State Police officers—where the victim was himself a uniformed officer—was improper. The trial judge consistently overruled the objections. The judge noted for the record the "high emotions, high tensions and ill feeling" engendered by the case. * * * He noted that there had been instances of community violence and threats to jurors as well as witnesses. The judge thus ruled that:

"[T]he elaborate security provisions that have been taken are necessary to insure the fair and proper administration of justice."

As to security arrangements at trial, *State v. Basford*, 1 Wash.App. 1044, 467 P.2d 352 (1970), states:

While he is presiding at a trial, the trial court is required to direct, control and regulate the proceedings as its chief officer. True, he has a grave responsibility to insure that a defendant charged with commission of a crime be given a fair and impartial trial. However, he has an equally grave responsibility to protect the other officers of the court as well as the

members of the public in attendance. * * When requested to perform a specific act which calls for a possible balancing of these grave responsibilities upon the scales of justice, the court must necessarily choose from among a wide variety of possible choices all within the permissible areas of judicial discretion.

*State v. Myrick*, 228 Kan. 406, 616 P.2d 1066 (1980), states: "The balancing of the competing interests lies within the discretion of the trial judge, for it is he who is best equipped to decide which security measures should be adopted."

Defendant's general claim is that he was prejudiced by the security arrangements of the trial court. We review the security arrangements only to determine if the security arrangements were an abuse of discretion by the trial court. *People v. Santo*, 43 Cal.2d 319, 273 P.2d 249 (1954), *cert. denied* under the name of *Graham v. California*, 348 U.S. 959, 75 S.Ct. 451, 99 L.Ed. 749 (1955); *Pierpont v. State*, 49 Ohio App. 77, 195 N.E. 264 (Ct.App.1934). Our general answer is that there was no abuse of discretion because the transcript does not show any prejudice to defendant and does not show a denial of a fair and impartial trial.

We set out defendant's claims in the trial court.

(a) Prospective jurors were examined individually as to their qualifications. During this examination, defense counsel stated that Mr. Pete Ross (a State Police Agent, who testified for the State) was questioning people as they entered the courtroom. Defense asked that Ross be instructed to "absent himself from any contact with any potential juror * * * and * * * refrain from questioning anyone who wishes or desires to enter this Courtroom." The prosecutor explained that Ross was only temporarily serving as a guard at the courtroom door because the person detailed as a guard had not arrived. The court required Ross "not to contact or to speak with any jurors or any participants who come in the Courtroom. * * * The Court does not take his

standing near the rear entrance of the Courtroom as being violative of any process rights of any individual. * * * [A]s soon as a substitute security officer has arrived * * * the substitute officer [shall] relieve Mr. Ross and—and thereafter, Mr. Ross should, in accordance with the requests of the parties, be excluded from the Courtroom. * * * "

(b) During examination of prospective jurors, defense counsel stated that he had seen "Mr. Ross in the jury room, calling the witnesses out. * * * acting as a bailiff in this Court." Clarifying his contention, defense counsel stated that Ross "was with the jury in the jury room during voir dire." Immediately prior to selection of the trial jury, the court stated, to the panel from which the trial jury was selected, that during the first or second day of juror qualifications, the deputy clerk asked Ross to summon a prospective juror to the courtroom. The court inquired: "I would like to see if anyone in this group was summoned by Mr. Ross while you were in the jury room, did— was anyone here asked to come out by that gentleman, has anybody here discussed any portion of this case with the gentleman. * * * " The court noted there was no response in the affirmative.

(c) Defense counsel objected that a state police officer had been sitting outside the jury room and taking care of access to the jury room "for the last two days and the first day of trial." From the content of this remark, we understand the complaint to be that a state police officer was seated in the rear of the courtroom near the entrance to the jury room from the courtroom.

Counsel also objected that "this noon, as the jury left the courtroom, there were two State Police Officers standing in the [public] hallway on either side of the stairway in uniform. I have no objection to the State Police Officers being in the courtroom, but to have them standing around in uniform is entirely inappropriate in a case like this."

The court pointed out to counsel the need for security and reminded counsel of reports to the court of improper contacts with a juror and a witness. "[T]he Court has determined that security is necessary during the court proceedings and finds no impropriety in having the Officers either uniformed or * * * in plain clothes during the Court Proceedings." On appeal, "defendant does not complain about trial security itself. It was amply justified by the circumstances." This concession covers other trial objections by defendant to the presence of uniformed officers in the courtroom, that jurors "had to file past" uniformed officers and that individuals were "checked" as they entered the courtroom.

(d) After the jury began deliberating, the jurors were excused for the night. Rather than secure the exhibits, the jury room was secured. Defense counsel complained that State Police Officer Mascarenas (also a prosecution witness) had been in the jury room after the jurors had left. "[B]esides the exhibits, I don't know anything else that would be lying around there, but of course * * * the sanctity of the juryroom [sic] cannot be violated. * * * " The trial court conducted an evidentiary hearing. The testimony was that the bailiff in charge of the jury, while escorting the jury down the public stairs, became concerned with whether the percolator had been unplugged. The bailiff asked Mascarenas to tell Richard (Gonzales, the deputy court clerk) to be sure the coffee pot was unplugged. Mascarenas entered the jury quarters as far as the restrooms, gave the message to Gonzales, who was in the jury room cleaning up the coffee cups and ash trays, and immediately left. The testimony is that Mascarenas did not look into the jury room.

(e) Defendant also complained that "[t]his morning at breakfast" (on February 20, 1981), a state police officer and a police officer from the Town of Chama, had breakfast with alternate jurors and chatted amiably with the alternate jurors. The transcript shows that the alternate jurors had been segregated from the other jurors when the jury began deliberating on the afternoon of February 19, 1981. There is nothing indicating that any alternate juror participated in the verdict or had any con-

tact with other jury members after being segregated from them.

(f) Late in the trial, defense counsel asserted that the security considerations in his "original complaints" had continued unabated, and then shifted to a complaint that Ross (referred to above) and Lopez (also a State Police Officer who testified for the State), "are the people who are in the hallways escorting the jury down the hallways and outside the Courtroom. * * *" "My specific objection * * * is that Agent Ross and Lopez remain in close proximity to the jury, as a result of those security precautions. * * *" After the jury began deliberating, defense counsel expanded this complaint. He asserted that state police officers were standing in a "narrow isleway [sic]" through which jurors had to pass to get to the jury box. His complaints about specific police officers also expanded. In addition to Ross and Lopez, he complained that security was provided by State Police Officers Sanchez and Mascarenas, who were also witnesses in the case.

The court again reviewed the need for the extensive security, a need which is not questioned in the appeal. "The Court has taken * * * precautions in this case to insure that the jurors are protected, that witnesses are protected. It has included specific instructions that the jurors are to be escorted from the Courtroom to their cars and seen off safely."

The trial court did not specifically address the claim of defense counsel that four state police officers, who testified as prosecution witnesses, were also providing security for the jurors. The transcript of this extended trial shows the court meticulously considered counsel's security complaints; thus the court may not have understood that defense counsel had shifted his complaint from security in general, and from security provided by the state police, to a complaint of security provided by four state police officer witnesses. This, however, is the specific complaint on appeal; defendant's brief alleges that the use of witnesses as courtroom security personnel was improper and prejudicial, and deprived defendant of due process. Defendant states: "The use of witnesses in this capacity was patently improper."

Defendant does not complain, on appeal, of the matters discussed in paragraphs (a) through (e). We have discussed those matters because they show that defense counsel's complaints about security arrangements were consistently overstated. The same is true of the complaint about the four state police officer witnesses. The overstatement is:

(1) Defendant asserts that Ross, Lopez, Mascarenas and Sanchez provided security. The transcript shows that Mascarenas was assigned to the security detail; it also shows that Ross served as a door guard for a short time while the qualifications of prospective jurors were being examined. There is nothing indicating that Lopez and Sanchez were assigned to the security detail. For the purpose of this appeal only, we will assume that the four state police officers were assigned to provide security.

(2) Security was provided for several purposes. Three of the purposes were: physical security of the courthouse, security of jurors and security of witnesses. The testimony that shows Mascarenas was on the security detail also shows that he was outside the courtroom doors, *after* the jury had left and *after* the day's court proceedings had been completed. Defendant's brief states: "In addition to providing general security, at least two of the policemen—Agent Ross and Officer Sanchez—escorted and guarded the jurors." Defendant cites no transcript reference in support of this statement and, in reviewing the defendant's security claims during the trial, we have found no support for the statement. Our point, simply, is that if the four state police officers provided security, there is nothing indicating what type of security they provided, other than the door guarding by Ross and Mascarenas.

(3) Even if the four state police officers did, at some unidentified time, provide security for the jurors, how frequently was this security provided? Prospective jurors were qualified and the jury was selected in

January, 1981; the trial was from February 9 through February 21, 1981. Defendant asserts that the four officers' "contact with the jury in this case was lengthy", again without a supporting transcript reference.

(4) Even if the four state police officers did provide security for the jurors, there is nothing indicating the security provided was other than as guards. There is nothing indicating the guard detail had any communication with the jurors.

In light of the foregoing, the cases relied upon by defendant are not applicable. There is nothing indicating the jurors were "continuously in the company" of the four state police officers, or that the officers "freely mingled and conversed with the jurors in and out of the courthouse during the trial." *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). There is nothing indicating that the four state police officers were "assigned to shepherd" the jury or had " 'private talk,' " with the jurors. *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). The four state police officers were not in charge of the jury; the bailiff was in charge of the jury. See *State v. Tyarks*, 433 S.W.2d 568 (Mo.1968). The speculation relied upon by defendant in his appellate claim did not give rise to a presumption of prejudice. *State v. Gutierrez*, 78 N.M. 529, 433 P.2d 508 (Ct.App.1967).

The record in this case does not show any prejudice to defendant from security arrangements which may or may not have included the four state police officer witnesses for the State; rather, the contrary is shown. The evidence would have sustained a conviction of second degree murder and may have sustained a conviction of first degree murder. Defendant was acquitted of murder; his conviction of voluntary manslaughter is based primarily on defendant's own testimony. The jury result shows that defendant's claim of prejudice from security arrangements is meritless.

The judgment and sentences are affirmed.

IT IS SO ORDERED.

LOPEZ and DONNELLY, JJ., concur.