726 P.2d 837
**STATE of New Mexico,**
**Plaintiff-Appellee,**

v.

**Joel Lee COMPTON,**
**Defendant-Appellant.**

No. 15218.

Supreme Court of New Mexico.

Feb. 17, 1986.

Stay Granted March 5, 1986.

Stay Dissolved Oct. 22, 1986.

Janet Clow, Chief Public Defender, David Stafford, Appellate Defender, Santa Fe, for defendant-appellant.

Paul Bardacke, Atty. Gen., Tony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

RIORDAN, Chief Justice.

Joel Lee Compton (Compton) was convicted of capital murder and aggravated assault. He was sentenced to death for the murder and eighteen months imprisonment for the aggravated assault. Compton appeals. We affirm.

The issues on appeal are:

I. Whether the trial court erred in admitting into evidence the testimony of Wrayan Humphries, Compton's wife, despite Compton's claim of husband-wife privilege.

II. Whether the state's argument during the penalty phase was improper, rendering the sentence impermissible under the doctrine of fundamental error.

III. Whether the imposition of the death sentence in this case is excessive or disproportionate under the circumstances.

IV. Whether the New Mexico statutory scheme for imposing the death penalty is unconstitutional in that it places a defendant who waives his right to remain silent on a better legal footing than a defendant who exercises that constitutional right.

V. Whether the jury must find that a defendant *knew* his victim was a peace officer before the death penalty can be imposed for the aggravating circumstance of killing a peace officer.

VI. Whether the New Mexico death penalty statutes violate due process in that the jury instructions demand a unanimous verdict in the penalty phase, where in fact a non-unanimous finding is equally conclusive.

VII. Whether the trial court erred in refusing to give Compton's tendered instructions on mitigating circumstances.

VIII. Whether the New Mexico death penalty statutes are unconstitutional in that the listed mitigating factor: "defendant did not have any significant history of prior criminal activity" is impermissibly vague.

IX. Whether the New Mexico death penalty statutory scheme is unconstitutional in that it provides no specific standards of evidence for the jury deliberations, shifts the burden of persuasion onto the defendant and fails thereafter to provide for meaningful appellate review.

X. Whether the trial court erred in conducting and permitting "death qualification" of the jury pool, and in the striking for cause of an anti-death penalty juror.

XI. Whether imposition of the death penalty is unconstitutional as violative of the Eighth Amendment's prohibition against cruel and unusual punishment.

*Facts.*

Compton and his wife, Wrayan Humphries (Wrayan), and her young daughter, left their home in Texas and travelled through several states before coming to Albuquerque in mid-February, 1983. They rented Room 24 at the Tewa Lodge on Central Avenue. Nearly destitute and unable to find work, Compton began to drink heavily. On February 24, 1983 he had been drinking all day.

That evening, Compton exchanged words with another patron at El Cid's Bar, threatening to shoot the man. No further contact ensued and Compton returned to the Tewa Lodge after stopping at a liquor store. Once there, he went to Room 25 and began banging on the door and yelling about the loud music coming from inside. He had complained earlier about the music and the "pimps" inside. Compton forced his way into Room 25 and began an altercation with the occupants. These occupants managed to push Compton out of their room. He subsequently returned to Room 25 with a rifle and began punching out several windows. The fight resumed and spilled into the parking lot. A passing couple saw the struggle over Compton's rifle and called the police. A friend of Compton's took the rifle away and the fighting stopped. Compton had been injured in the altercation and his arm was bleeding badly. Compton retrieved the rifle and again challenged the occupants of Room 25. Everyone scattered when Compton discharged a shot into the street. Compton and Wrayan then returned to their room (Room 24) and Compton sat at a table. He asked Wrayan how everything was outside and she replied that the police were coming.

Officer Gerald Cline (Cline) of the Albuquerque Police Department was dispatched to the Tewa Lodge after a call about a man with a rifle. With Cline was Alfred Gibson (Gibson), a citizen participating in the police department's "ride-along" program. Gibson testified that as the police car pulled into the parking lot of the Tewa Lodge, he saw a man standing in the doorway of Room 24. The man then turned and walked down the sidewalk and into the darkness.

Cline got out of his vehicle to investigate, leaving his revolver in its holster. He checked rooms 25 and 24, speaking into his walkie-talkie that a subject was walking away. Suddenly a shot rang out. Cline shouted something and then collapsed. From the shadows a man emerged with a rifle, stood over Cline's body and then moved on. Gibson testified that this was the same man he had seen earlier standing in the doorway of Room 24. This man was later identified by witnesses as Compton.

Compton then ran with the rifle across the street and approached the car of Carl and Sandra Smith, who had just driven up to a nearby restaurant. Compton pointed the rifle through the car window at Mr. Smith, who begged him not to shoot. As other police cars began arriving at the scene, Compton promptly threw the rifle onto the roof of the Smith's car. He then lay prone, spread-eagled, in the parking lot. Compton was apprehended in that position shortly afterward by other officers that had arrived at the scene.

It was later determined that Cline died almost instantly from a single bullet wound through the heart.

## I. Wrayan Humphries' testimony.

■ NMSA 1978, Evid. Rule 505(a) (Repl.Pamp.1983) defines a communication as confidential if it is made privately and if it is not intended for further disclosure. Evid.Rule 505(b) further states:

A person has a privilege in any proceeding to refuse to disclose and to prevent another from disclosing a confidential communication by the person to that person's spouse while they were husband and wife.

Evid. Rule 505(c) shows that the privilege may be claimed by the spouse making the confidential communication or by the spouse to whom the confidential communication was made.

■ The challenged testimony herein concerned a conversation between Compton and Wrayan moments before the shooting of Cline. After a hearing, the trial court concluded that the husband-wife privilege had been waived by Wrayan when she made a sworn statement to police shortly after the shooting. *See* NMSA 1978, Evid.R. 511 (Repl.Pamp.1983). On appeal, Compton argues that the admission of Wrayan's statement was error. He argues that since it is Compton and not Wrayan claiming the privilege in this case, NMSA 1978, Evid. Rule 512(b) (Repl.Pamp.1983) applies to negate the claim that Wrayan waived the privilege. That rule states:

> Evidence of a statement or other disclosure of privileged matter is not admissible against the holder of the privilege if the disclosure was * * * made without opportunity to claim the privilege.

Compton contends that as a holder of the privilege, Wrayan's disclosure to police after the shooting of Cline was made when he did not have an opportunity to claim the privilege, and therefore, Wrayan's statement should be inadmissible against him. Compton thus argues that the trial court erred in ruling that Wrayan waived the privilege and by allowing admission of her statement. We agree with Compton that the trial court erred in admitting this statement. However, we conclude that the admission of Wrayan's statement was harmless error because it could only have had an insignificant effect on the verdict, in light of the other evidence that was introduced at trial showing Compton's awareness that a police officer was on the premises.[1]

For trial court error to be considered harmless, there must be:

> (1) substantial evidence to support the conviction without reference to the improperly admitted evidence, (2) such a disproportionate volume of permissible

evidence that, in comparison, the amount of improper evidence will appear so miniscule that it could not have contributed to the conviction, and (3) no substantial conflicting evidence to discredit the State's testimony.

*State v. Moore*, 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980) (citations omitted).

In the instant case, there was testimony presented through Mr. Gibson (who was riding in the patrol car with Cline) that, upon their arrival at the Tewa Lodge, he saw Compton standing in the doorway of Room 24. Further, there was no substantial conflicting evidence that would have discredited the testimony of Gibson. Therefore, although the admission of Wrayan's testimony was error, it was harmless error and Compton's conviction is properly affirmed under this point.

## II. Prosecutorial misconduct in sentencing phase.

■ Compton claims on appeal that he was denied due process during the sentencing phase of his trial because the prosecutor's closing and rebuttal arguments were improper. Compton made no objection to the arguments, though he did move for a mistrial immediately thereafter on the grounds claimed here. Ordinarily, unless a timely objection is made to an allegedly improper comment, it will not be reviewed. *State v. Ruffino*, 94 N.M. 500, 612 P.2d 1311 (1980). Compton concedes this point but contends that in a capital sentencing trial, egregious prosecutorial misconduct violates the due process requirement of fundamental fairness, and so constitutes fundamental error.

Certainly it would have been preferable for Compton's counsel to have entered timely objections so that any alleged errors could have been corrected by the trial court, who is in the best position to gauge

---

1. Issue V addressed infra, that the jury should have been required to find that Compton knew that his victim was a peace officer is also encompassed in our finding of harmless error. Our handling of that issue makes it clear that Compton's knowledge of his victim's status as a police officer is irrelevant under the statute and therefore, the communication between Wrayan and Compton prior to Cline's shooting is unnecessary and irrelevant to the imposition of a death sentence upon Compton under the aggravating circumstance of killing a peace officer in the lawful discharge of his duties.

their impact and to admonish the jury accordingly. Nevertheless, since the alleged errors complained of here occurred during the sentencing determination or sentencing phase of Compton's trial and, since "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination", we will address the issue of improper argument. ·*Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985) (quoting *California v. Ramos,* 463 U.S. 992, 998–999, 103 S.Ct. 3446, 3451, 77 L.Ed.2d 1171 (1983)). Thus, we turn now to an analysis of the prosecutor's remarks at Compton's sentencing hearing.

1. In closing argument,[2] the prosecutor stated that "I feel the death penalty is an appropriate sentence in this case." Then, on rebuttal, the other prosecutor said: "I want to step out of my role as an advocate for a minute, and tell you personally, I don't believe in the death penalty in all cases, so you know where I am coming from."

Compton argues that these statements by the prosecution violated the due process requirement of fundamental fairness in that such statements encourage the jury to impermissibly rely on the prosecutor's selective decision in seeking the death penalty. Compton argues that such argument improperly suggests that the prosecutor, as an agent for the state and thus having an added "mantle of authority" has selected this case as particularly deserving of the death penalty. Compton argues that such argument infringes upon the jury's discretion in making its decision for a proper penalty, life or death. In support of his argument that such comments by the prosecutor are improper and cause fundamental unfairness, Compton relies on *Hance v. Zant,* 696 F.2d 940 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), and its progeny. *See, e.g.,*

*Tucker v. Zant,* 724 F.2d 882 (11th Cir. 1984).[3] Many of the comments complained of here are similar to comments held to be prosecutorial misconduct in both *Hance* and *Tucker.* We note that *Hance* was subsequently overruled in *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.), *petition for cert. filed,* 54 U.S.L.W. 3254 (1985).

▪ An attorney's personal opinions, not tied to the evidence, are irrelevant to the sentencing jury's task. *Brooks v. Kemp,* 762 F.2d at 1408. However, the effect of these comments was insignificant when viewed in light of additional comments made by the prosecutor which mitigated the possible adverse impact of the original statements. In the closing argument, the prosecutor here did not state or imply that he had selected this case from among the mass of cases that could be death penalty cases. Instead, he stated many reasons why he believed this case appropriate for the death penalty, referring to the evidence introduced at trial and giving reasons for his opinion. All of these reasons for seeking the death penalty were exhaustively laid out by the prosecutor during his closing argument. It was only after all these reasons had been laid out before the jury that the prosecutor made the statement of which Compton now complains. The same is true about the comment made by the prosecution during rebuttal. In each instance, the prosecution laid out the facts upon which the request for the death penalty had been made. It was left to the jury to independently decide whether there was any validity to any of these underlying factors.

▪ Also, any adverse impact of the comments by the prosecution was alleviated still further because throughout both the closing and rebuttal arguments the prosecution made it perfectly clear that the decision was that for the jury. At the beginning of closing argument the prosecu-

---

**2.** The remainder of the allegedly improper comments came during rebuttal.

**3.** Compton principally relies on both of these cases in support of his remaining arguments

that various comments made by the prosecution during rebuttal caused fundamental unfairness in the sentencing phase of his trial.

tor stated, "[b]ut I will ask you to consider that this case is appropriate for a death penalty because the defendant took from Jerry Cline what he had no right to take. He took Jerry Cline's right to live, and Jerry Cline did not have a jury to judge whether he should live or die." On rebuttal, the prosecutor stated: "You did not pull the trigger on February 24, that killed Officer Cline, his parents did not, the alcohol did not. The defendant did that act. That makes him subject now to *your* decision, and if *you decide* to give him the death penalty today, it will be his responsibility and his fault. * * * This is a very personal decision, in this kind of decision it is so fundamental that [it] is a matter of life and death. *It is up to all of you,* and no one is going to criticize you for what you are doing in this case, on either side." (emphasis added)

Further, defense counsel also made it unmistakably clear that the jury had sole responsibility for deciding Compton's fate. Throughout her closing argument, defense counsel made repeated remarks placing the responsibility for Compton's death (should a death sentence be imposed) upon the jury. Such remarks included: "[a]nd I wondered what it's like to stand up in front of twelve people on the other side, and to argue to kill a human being, and I realize you're a buffer for the prosecutor, *because you are the ones who will make that decision.* And when this case is over, they can go home, and they can wash their hands, and they can tell themselves, 'I did my job.' *But the jury made the decision.* * * * This case is about life and death at this point. *That's the decision that you are faced with.* The decision of whether to kill a human being. * * * The State of New Mexico has handed each and every one of you a loaded gun. And there are not any blanks in those guns, ladies and gentlemen, they are real bullets. And they are bullets that will kill. * * * Ladies and gentlemen, *you're the ones with your fingers on the trigger,* and I've stood up here and I've done my best, and now I'm gonna take Joel Compton's life, *and I'm gonna turn it over to you."* (emphasis added)

Thus, given the foregoing arguments, we are satisfied that the jury, in making its decision to give Compton the death penalty, was under no illusion that its role was only minimal. We determine that the jury *clearly* understood that the responsibility for determining Compton's fate rested only with them and no one else.

▪ 2. The prosecutor recited a scene from "The Godfather" motion picture. This portion of the prosecution's rebuttal was as follows:

This is a death penalty case for two reasons. First of all, because of the things I've talked to you about in closing, because we make police officers do such terrible jobs, we want to give them some mantle of protection so they'll keep coming, so that when somebody's having a neighborhood dispute next door you can call and the police will come, and they feel society will protect them when they come. The second reason goes to something I learned my very first day in law school, and I had a law professor, very first day, first thing to us in a lecture was, "have all of you seen The Godfather?" We all looked, didn't know what he was talking about, he said, "well, do you remember the scene in the very start of The Godfather where the person comes in to the Godfather and says 'my daughter has been raped, Godfather, and the men got off that killed her, and do something, won't justice do something?' and the Godfather sent his thugs out to beat up these guys that raped this guy's, uh, daughter." Well, what the law professor told us was, "ladies and gentlemen, did I offend any of you?" And nobody was offended, and he said, "that's because that was justice." That was justice, and what he said to me, what he said to all of us, all of us first year law students, was if you do not make the system work, that's the kind of justice that applies. That's the kind of justice that takes over if the system does not work to protect these people, that that's the kind of justice that takes over.

And ladies and gentlemen, either the police are going to stop going to the scene if we don't protect them, or they're going to start shooting first. And we don't want that to happen, and you've heard of police shooting people under bad circumstances, and the reason Mr. Shane talked to you about protecting police is you don't want police to make that decision, to go out and shoot first and ask questions later when they see somebody with a gun. You want them to behave as Gerald Cline did, to get out without your gun, so you can approach the person and, and attack that situation in a peaceable manner. That's what you want to do, and then the decision as to what happens later will be made by twelve people, not one person on the street in that circumstance. So that's the reason, that's the reason that is an aggravating circumstance, and so serious for the death penalty.

Taken in context, the prosecution's reference to "The Godfather" was simply made as an example of why this particular case merits the death penalty. It was made to show the need for society to protect its police officers so that they will keep doing the job that they do for society. The reference to "The Godfather" was apparently made in an attempt to help the jury understand that the particular aggravating circumstance in this case—killing a peace officer in the lawful discharge of his duties—is to protect the police officer and to insure that the police officers fulfill their duties in a diligent and peaceable manner. We determine that this reference to "The Godfather", when taken in context, was not improper.

■ 3. The next comment complained of by Compton came when the prosecutor stated: "Society has the right to kill its enemies to survive." Again, this comment is taken out of context. The comment was made in the following context:

So why, why the death penalty? I think it boils down to the right to self-defense. The right to survival, that instinct in all of us that keeps the little

tree clinging on to a rock, a little scrub oak tree, even though there's no other dirt around it. The instinct that keeps the antelope running away from the lion. It's the instinct that all of us can understand, the right to survival. And ladies and gentlemen, society has the right to survive, the right to self-defense, the right to protect itself. Society has the right to kill its enemies to survive.

■ Under *Brooks v. Kemp,* one of the proper lines of argument during the sentencing phase involves the consideration of the accepted justifications for the use of the death penalty. These justifications are retribution and deterrence. *Brooks v. Kemp,* 762 F.2d at 1407. It was held in *Brooks* that:

[J]ury consideration of the appropriateness of retribution in the particular case is both proper and inevitable. Similarly, with respect to specific deterrence, the jury may appropriately consider whether a particular defendant is so likely to be dangerous in the future and so unlikely to be rehabilitated that incapacitation is warranted. Even general deterrence, while principally a concern for the legislature, can be considered in fixing a punishment. * * * Neither reason nor precedent suggests that we should raise a constitutional barrier to such arguments.

*Id.* (citations omitted). We agree with *Brooks* that "[w]hile the phrase 'enemy of society' [is] harsh, we do not seriously fault its application to one whose crime is 'so grievous an affront to humanity that the only adequate response may be the penalty of death.'" *Id.* at 1412 (citing *Gregg v. Georgia,* 428 U.S. 153, 184, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976)).

■ 4. Compton next alleges improper comment when the prosecutor stated: "Ladies and gentlemen you cannot give this man the chance to hurt somebody else. Society has the right to end it here, and you stand between the defendant and society." We determine that this comment was an appropriate reference to the fact that the jury was charged with making the ulti-

mate decision as to Compton's fate. *Accord Brooks v. Kemp,* 762 F.2d at 1412.

5. Compton's next contention as to the inappropriateness of the prosecution arguments during rebuttal regards the fact that the prosecution urged imposition of the death penalty to protect people both inside and outside of the prison. These comments were as follows:

> And who needs protection? If he goes to prison, the people in prison need protection, and that may sound funny coming from a prosecutor, but those people up there aren't all murderers, there are people who do little petty crimes and get sent to the pen, and they're up there too. And they need protection from Joel Compton, they have a right not to be killed or beaten up, like he's beaten up people over in the jail, over a chair, they have that right, and they need your protection. The police need your protection, and after prison, the people in this community need your protection. And what you need to know in this case is that the defendant may be out. * * * But in this state he may be released, he may be back in society. And there's a good chance of that. And why that's important is because, from all the testimony, and you've heard it all, this man is dangerous. * * I'd ask you to give him the death penalty to protect the people in this community, the people in other communities where the defendant may go, to protect the people at the penitentiary, and to protect the police.

█ We determine that this was proper argument. Its effect was to merely point out to the jury the future dangerousness of this particular defendant. It was proper to put the issue before the jury for its consideration. *See Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *see also, California v. Ramos,* 463 U.S. 992, 1002 n. 16, 103 S.Ct. 3446, 3453 n. 16, 77 L.Ed.2d 1171 (1983); *Brooks v. Kemp,* 762 F.2d at 1406.

Thus, based largely upon the reasoning of *Brooks v. Kemp,* (overruling *Hance v. Zant,* the case on which Compton principally relies for his allegations of prosecutorial misconduct) and our reading [4] of the entire arguments made during the sentencing phase and, taking all such arguments in context, we determine that there was no prosecutorial misconduct depriving Compton of his due process right to fundamental fairness during the sentencing phase of his trial. Other cases that have dealt with similar comments made by prosecutors during the sentencing phase and that have upheld such comments are: *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982) (closing remarkably similar to that in the instant case upheld as proper); *State v. McDonald,* 661 S.W.2d 497 (Mo.1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985) (need for society to protect itself need not have support in the evidence); *Commonwealth v. Travaglia,* 502 Pa. 474, 502–503, 467 A.2d 288, 302 (1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984), (prosecutor's statement, "Right now, the score is [defendant] two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty," held to be merely "oratorical flair" in arguing in favor of the death penalty); *Clanton v. Commonwealth,* 223 Va. 41, 54, 286 S.E.2d 172, 179 (1982) (prosecutor's comment, "Do not sentence the other inmates of the Virginia State Prison to death at the hands of Earl Clanton. Don't give him the chance to take somebody else's life," held to be valid argument in regard to defendant's propensity to commit crimes of violence); *People v. Jones,* 94 Ill.2d 275, 299, 68 Ill.Dec. 903, 447 N.E.2d 161, 172–173 (1982), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983) (prosecutor's comment, "How about the guards in that institution, and the inmates in that institution, are you so sure that you can preserve

---

4. In addition to listening to the taped transcript of closing arguments, we also had the tapes transcribed for our review.

him from committing crime again by doing anything other than what he deserves, the death penalty?" held to be proper argument).

### III. Proportionality review.

Compton asserts that his sentence was excessive or disproportionate to the penalty imposed in similar cases. We disagree.

■ The jury was instructed on the aggravating circumstance of NMSA 1978, Section 31–20A–5(A) (Repl.Pamp 1981). The jury unanimously determined that the aggravating circumstance existed and that its existence warranted the death penalty. In *State v. Garcia*, 99 N.M. 771, 664 P.2d 969, *cert. denied*, 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983) this court set forth the guidelines for proportionality review. In the instant case we have compared Compton's sentence with the facts and the sentence in the case of *State v. Montoya*, 101 N.M. 424, 684 P.2d 510 (1984).[5]

Upon review of the above-cited case, we do not find that Compton's sentence was disproportionate. Given the facts of the instant case, it is distinguishable from *Montoya* in that Compton essentially "ambushed" Cline. Compton walked from his hotel room to a position of hiding, and when the opportunity presented itself, he shot Cline through the heart. In *Montoya*, however, the evidence was that Montoya did not initially intend to kill Officer Larson. Thus, we determine that Compton's sentence is not disproportionate to that imposed in the appropriate review case. We also determine that Compton's sentence is not excessive given the crime committed. We further stress that the proportionality review in this state is principally directed to the particular circumstances of the crime committed and the specific character of the defendant. In reviewing the jury's deter-

mination we will not retry the case for what may be a better result. *State v. Garcia.*

### IV. Mitigating factor of cooperation with authorities.

■ Under NMSA 1978, Section 31–20A–6(H) (Repl.Pamp.1981) the jury may consider the mitigating circumstance that a defendant cooperated with authorities. Compton argues that this statutory provision is unconstitutional in that it allows for imposition of the death penalty based upon the exercise of the right to remain silent. This precise issue was resolved against Compton in *State v. Guzman*, 100 N.M. 756, 676 P.2d 1321, *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984).

### V. Knowledge that victim was a peace officer.

■ Compton argues that the aggravating circumstance of killing a peace officer as outlined in Section 31–20A–5(A), cannot constitutionally support the imposition of the death sentence unless the jury finds that a defendant *knew* that his victim was a peace officer. We disagree.

Under a similar federal statute relating to federal officers (18 U.S.C. § 111 (1970)), only proof of the intent to assault is required, not proof of the intent to assault a federal officer. The United States Supreme Court upheld this statute and stated:

> The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual * * * affected. In a case of this kind the offender takes his victim as he finds him. The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial [remedy].

5. Compton also urges us to compare his case with that in *State v. Garcia; State v. Robinson*, 99 N.M. 674, 662 P.2d 1341, *cert. denied*, 464 U.S. 851, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983); *State v. Martinez*, 97 N.M. 540, 641 P.2d 1087 (Ct.App.), *cert. denied*, 98 N.M. 50, 644 P.2d 1039

(1982); and *State v. St. Clair*, S.Ct. No. 13,912 (Decision filed June 25, 1982). However, under the guidelines adopted in *State v. Garcia*, neither of these cases is appropriate for proportionality review.

*United States v. Feola,* 420 U.S. 671, 685, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975). Under *Feola,* the Court determined that the legislative history indicated Congress's intent in enacting the statute to be the protection of federal officers and federal functions and to provide a federal forum in which to try alleged offenders. We think it is obvious that our legislature had the same intent when it adopted, as an aggravating circumstance, the killing of a peace officer in the lawful discharge of his duties.

Under Compton's view, such reasoning would apply to many other areas in the criminal law. For example, crimes involving deadly weapons generally result in higher penalties than those not involving deadly weapons. However, we do not require the state to prove that a defendant *knew* that the weapon he used was "deadly". NMSA 1978, §§ 30–7–1 through 30–7–4 (Repl.Pamp.1984). In any case for conviction under these statutes, a defendant would be able to argue that the state must prove that he *knew* that the weapon was "deadly". Also, all statutes that provide for penalties for crimes against peace officers would require that the state prove that a defendant *knows* that the victim is a peace officer. NMSA 1978, §§ 30–22–21 through 30–22–26 (Repl.Pamp.1984). Further, in death penalty cases the state would be required to prove that a defendant *knew* that his victim was a peace officer, inmate or guard. § 30–20A–5. In sentencing proceedings, it could be argued that a defendant cannot be given an enhanced sentence unless he had *knowledge* of the factors that had enhanced the sentence when he committed the crime. For example, under NMSA 1978, Section 31–18–16.1 (Repl. Pamp.1981) it could be argued that a defendant must *know* that the victim is over sixty (60) years of age before the enhanced sentence can be imposed. Under the habitual criminal enhancement statute, NMSA 1978, Section 31–18–17 (Repl.Pamp.1981), the state would have to prove that a defendant *knew* that he would be subjecting himself to an enhanced sentence if he commits another crime. Finally, when charged with the use of a firearm, NMSA 1978, Section 31–18–16 (Repl.Pamp.1981), the state would have to prove that a defendant *knew* that he was subjecting himself to a mandatory jail term if he uses a firearm.

Thus, in adopting Compton's view of the aggravating circumstance herein, this Court would be inventing instances where intent would necessarily have to be proved in situations where the legislature never intended such intent to be an element of the crime. Further, Compton's argument misconstrues the purpose of aggravating circumstances. Aggravating circumstances are intended to serve as a channeling and narrowing of the bases upon which the death penalty can be predicated. *See, e.g., Zant v. Stephens,* 462 U.S. 862, 872, 103 S.Ct. 2733, 2740, 77 L.Ed.2d 235 (1983). The aggravation factors concern the circumstances surrounding and attending a capital murder. They are *not* elements of capital murder, but are instead intended to explain the kinds of circumstances that our legislature has determined warrant the most severe punishment for capital murder. The aggravating circumstances are not quasi-criminal violations in and of themselves. Where the legislature believed that intent was an appropriate criteria upon which a death sentence could be based, it included the specific requirement of intent to kill in the given aggravating circumstance. *See* § 31–20A–5(B), (C), (D) and (E). Thus, we determine that the jury was properly instructed on the aggravating circumstance of killing a peace officer.

## VI. Constitutionality of death penalty instructions.

Under this point Compton argues that two uniform jury instructions, NMSA 1978, UJI Crim. 39.33 and 39.43 (Repl.Pamp.1982) violate due process in that they lead the jury into improper deliberations and an impermissible imposition of the death penalty.

UJI Crim. 39.33 reads in pertinent part: "If you fail to unanimously agree that the death penalty should be imposed, a penalty of life imprisonment will be imposed by the court." UJI Crim. 39.43 reads in pertinent

694

part: "In order to return a finding, it is necessary that each juror agrees. Your finding must be unanimous." Under UJI Crim. 39.33 the jury is instructed that its verdict for death must be unanimous and, if a unanimous verdict for death cannot be arrived at, then a life sentence will be imposed. However, UJI Crim. 39.43 directs the jury that its findings must be unanimous. Compton contends that UJI Crim. 39.43 erroneously leads the jury into believing that they can only return a unanimous verdict, that verdict being a unanimous vote for death. We disagree.

Compton ignores the remaining portion of UJI Crim. 39.43. It reads:

Your findings must represent the considered judgment of each juror. In order to return a finding, it is necessary that each juror agrees. Your finding must be unanimous.

It is your duty to consult with one another and try to reach an agreement. However, you are not required to give up your individual judgment. Each of you must decide the case for yourself, but you must do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own view and change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, *or for the purpose of reaching a finding.*

You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

This instruction makes clear that each individual juror is to maintain and uphold his or her own convictions when deliberating on any finding. It specifically states that the individual jurors should not be pressured into changing their opinion simply because their fellow jurors believe that a certain finding should be made. Further NMSA 1978, UJI Crim. 39.32 (Repl.Pamp. 1982) was given by the trial court in this case. It advised the jury that if they had

any reasonable doubt as to the existence of an aggravating circumstance, then it was their duty to find that the aggravating circumstance was not present. It further informed the jury that to find the aggravating circumstance their decision must be unanimous. The instruction also lays out a procedure to be used by the jurors in the event they cannot unanimously agree. UJI Crim. 39.33 was then given to the jury, informing them that if they unanimously agreed upon the existence of an aggravating circumstance then they were to proceed to the penalty question. The instruction further advised that if the jury could not unanimously agree on the death penalty then life imprisonment would be imposed by the court.

Considering all these instructions together, Compton's argument that the two instructions (UJI Crim. 39.33 and 39.43) encourage the jury to impose the death penalty (a unanimous verdict) as opposed to a life sentence (non-unanimous verdict) is without merit. We determine that the instructions cannot be construed as improperly encouraging the jury or any single juror to abandon a life decision in favor of a death decision for the sole purpose of simply maintaining unanimity. The instructions merely encourage the jurors to *try* to unanimously agree on the existence of an aggravating circumstance and the appropriate penalty. This is not unusual in death penalty cases. Jurors are routinely instructed to attempt to obtain unanimous verdicts on issues of guilt. *See* NMSA 1978, UJI Crim. 2.40 and 50.07 (Repl.Pamp. 1982). All of these instructions impose upon each juror a duty to consult in an effort to agree but not at the cost of surrendering individual judgment. *See, e.g.,* UJI Crim. 39.43. We find no coercion which would make it incumbent upon any juror to abandon his or her individual judgment and vote with their fellow jurors simply in the interest of unanimity. Therefore, these instructions, considered as a whole, do not coerce the jury to impose a death sentence after a possible initial non-unanimous vote.

**VII. The trial court erred in refusing to give Compton's tendered instructions on mitigating circumstances.**

As his seventh point on appeal Compton argues that the trial court erred in refusing to specifically instruct the jury on his tendered instructions of various non-statutory mitigating circumstances. We disagree.

Under NMSA 1978, UJI Crim. 39.30 (Repl. Pamp.1982), the jury was instructed:

Before determining the penalty to be imposed, *you must consider any mitigating circumstances you find to exist, including, but not limited to the following.* * * *

This instruction gave the jury broad discretion to consider *any* factor in mitigation of the death penalty, in addition to any statutory mitigating circumstances. We determine that this instruction was an ample and acceptable substitution for a specific written list of non-statutory mitigating circumstances.

**VIII. Constitutionality of mitigating circumstance of "no significant history of prior criminal activity".**

Compton argues that Section 31–20A–6(A) is impermissibly vague, thereby rendering that portion of our death penalty statute unconstitutional. We disagree. *See State v. Gilbert,* 100 N.M. 392, 671 P.2d 640 (1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984).

**IX. Constitutionality of New Mexico death penalty statute regarding guidelines for jury deliberations and burden of persuasion.**

Compton contends that the New Mexico capital felony sentencing statutes, Sections 31–20A–1 through 31–20A–6, do not provide guidance for the jury in weighing the aggravating circumstances of Section 31–20A–5 with the mitigating circumstances of Section 31–20A–6. However, this court has previously determined otherwise. *See State v. Garcia; State v. Gilbert.*

**X. Death qualification of jury.**

Compton contends that the trial court erred in conducting and permitting "death qualification" of the jury pool and in striking for cause an anti-death penalty juror. Compton contends that such process prejudiced the jury pool, rendered the jury pool "conviction prone", and denied him a jury composed of a cross-section of the community. However, this court has previously determined otherwise. *See State v. Trujillo,* 99 N.M. 251, 657 P.2d 107 (1982).

**XI. Death penalty as cruel and unusual punishment.**

Compton argues on appeal that the death penalty is unconstitutional as violative of the Eighth Amendment prohibition against cruel and unusual punishment. However, New Mexico law is to the contrary. *See State v. Garcia,* and cases cited therein.

**Conclusion.**

For the foregoing reasons, we determine that the convictions of Compton and the sentence of death imposed upon him for the murder of Officer Cline should be affirmed.

IT IS SO ORDERED.

FEDERICI and STOWERS, JJ., concur.

WALTERS, J., specially concurs.

SOSA, Senior Justice specially concurs and dissents.

WALTERS, Justice (specially concurring.)

I concur in the result reached by the majority, but disagree with the discussion under Part V. There was evidence in this case that Compton was directly facing the area into which the police car drove at the time Officer Cline arrived and got out of the marked police car. That evidence, with no evidence to the contrary, sufficiently establishes that defendant knew he was ambushing and shooting a police officer. The inclusion or exclusion of knowledge in the complained-of instruction would not, in this case, have altered the jury's verdict.

I wish to express my disagreement and my sense of unconstitutionality, however, with approval of a statute or an instruction that imposes an enhanced penalty upon a criminal act, not because of the actor's enhanced culpability, but solely because of the status of the victim, whether known or unknown to the accused. In my view, such a statute and such an instruction dispense with the very basic issue of notice, which is simply another face of *fundamental* fairness and due process. *Tijerina v. Baker*, 78 N.M. 770, 438 P.2d 514 (1968).

Justice Stewart cogently addressed the impropriety attached to judicial transformation of the common law and statutory requirement of scienter as a necessary element of guilt (of *any* aggravated offense) to recognition of such a requirement only if the legislative body expressly writes it into the statute, in his dissent to the opinion relied on by the majority, *United States v. Feola*, 420 U.S. at 696–713, 95 S.Ct. at 1269–78.

Regardless of the dubious reasoning of *Feola*, and the majority's disregard of the Supreme Court's caveat at 420 U.S. 686, 95 S.Ct. 1264–65, this Court is "the ultimate arbiter of the law of New Mexico. * * * [and, as such, it is] not bound to give the same meaning to the [due process clause of the] New Mexico Constitution as the United States Supreme Court places upon the United States Constitution, even in construing provisions having wording that is identical, or substantially so," so long as we do not narrow the liberties guaranteed under the federal constitution. *State ex. rel. Serna v. Hodges*, 89 N.M. 351, 552 P.2d 787 (1976). For us to hold that due process is not served by either the statute or the instruction, as written, could not possibly narrow the *Feola* holding. To the contrary, we would properly exercise our constitutional duty not only to fulfill the requirements of notice to the accused that the victim was a police officer and the accused's chance to be heard on that question, but also to assure that "causing [the specific] harm [charged] intentionally must be punished more severely than causing the same harm unintentionally." *Enmund*

*v. Florida*, 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982), quoting with approval from H. Hart, *Punishment and Responsibility* 162 (1968). In *Enmund*, the Court held that to punish one whose culpability was not the same as another's (as in the interpretation given by the majority to the statute and instruction herein, *i.e.*, that one who unknowingly kills a police officer is held to the same culpability and severity of punishment as one who knowingly does so), is, additionally, "impermissible under the Eighth Amendment." *Id.* Justice Marshall made an almost identical protest in objecting to denial of certiorari in *Baker v. Missouri*, 459 U.S. 1183, 1184–1188, 103 S.Ct. 834 at 834–37, 74 L.Ed.2d 1027 (1983).

I, therefore, dissent from the majority's discussion under Part V and from what I consider to be inappropriate analogies there attempted to be drawn. Some of them relied on are as defective in foundation as is the underlying disregard of *mens rea* which forms the basis of that portion of the majority's opinion here.

SOSA, Senior Justice, specially concurring and dissenting.

I concur with the affirmance of the convictions in this case for the reasons stated in the majority opinion. I respectfully dissent on the issue of the imposition of the death penalty. I would hold that the Capital Felony Sentencing Act, NMSA 1978, Sections 31–20A–1 through 31–20A–6 (Repl.Pamp.1981) violates the Fourteenth and Eighth Amendments to the U.S. Constitution and Article II, Sections 13 and 18 fo the New Mexico Constitution. Initially, the relevant Uniform Jury Instructions do not provide clear and objective standards to guide the jury's sentencing decision. While the defendant and the crime may only be considered in mitigation, and not in aggravation, the jury is not instructed to this effect. This underscores the fact that no effective guidance is provided the jury in its determination whether aggravating circumstances outweigh mitigating circumstances.

In particular, the facts of this case reveal the inadequacy of proportionality review by this Court as set forth in *State v. Garcia*, 99 N.M. 771, 644 P.2d 969, *cert. denied*, 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983). Only one case exists which meets the guidelines for comparison established in *Garcia*. In *State v. Montoya*, 101 N.M. 424, 684 P.2d 510 (1984), a defendant with prior felony drug convictions received a life sentence for killing an undercover policeman while trying to rob him during a major drug transaction. Compton, in comparison, had no prior felony convictions. He was described by an expert psychologist as a "lightweight" among the prison population who suffers from a personality disorder and an alcohol problem. In short, he was a far cry from the "enemy of society" which the prosecution made him out to be. The majority's cursory review does not even begin to assess the character of the defendant.

Although Compton's victim, Officer Gerald Cline, was an extremely popular and sympathetic individual in the Albuquerque community, Compton was ignorant of this at the time of the shooting. There is little else about the details of this crime which would make it more shocking or reprehensible than the *Montoya* case. In fact, Compton's conduct was so erratic, because his mental capacity had been diminished by the alcohol, that he would seem to merit a death sentence even less than one who killed a peace officer under other circumstances.

I can see no rational basis for imposing the death penalty upon one man who kills a police officer while another man received a life sentence for the same offense. It is, *a priori*, arbitrary and capricious for equally culpable offenders to be treated differently, especially when the difference is not a relative one of years, but the absolute one between life and death.

The very essence of Eighth Amendment jurisprudence is that a capital sentencing scheme must establish "a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972). The majority opinion fails to establish any such meaningful basis.

At the very least, because of the prosecutorial misconduct, I would remand to the trial court for a new sentencing proceeding on the capital murder conviction, pursuant to NMSA 1978, Section 31–20A–4 (Repl. Pamp.1981). I believe that the State's arguments at the penalty phase were so improper as to constitute fundamental error and thus denied defendant due process of law. *See Hance v. Zant*, 696 F.2d 940 (11th Cir.1983), citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *see also State v. Diaz*, 100 N.M. 210, 212, 668 P.2d 326, 328 (Ct. App.1983). The prosecution, in a criminal trial, is entrusted with a dual function—not just to seek convictions but also, more importantly, to guarantee that justice is done. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *see also* ABA Standards for Criminal Justice, 2nd Ed. (1982) § 3–1.1(b)(c); ABA Code of Professional Responsibility, EC 7–3. This duty is even greater when a man's life is at stake.

Given the constitutional infirmities already present in the New Mexico death penalty statutes and jury instructions, the jury might well have been unduly influenced by the prosecutor's improper remarks, which were the last things it heard before retiring. Reversal is required if there exists a reasonable possibility that the errors affected the outcome. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

By appealing to the emotions of the jury, the prosecutors strayed from their ethical and statutory duties; this Court is mandated to reverse a death penalty "imposed under the influence of passion, prejudice or any other arbitrary factor." NMSA 1978, § 31–20A–4(C)(3) (Repl.Pamp.1981).

Finally, both the Uniform Jury Instructions and the sentencing statute allow for unequal treatment of equally culpable de-

fendants. For these reasons, which I discuss in greater detail in my specially concurring opinion in *State v. Garcia*, I would remand this cause for the imposition of a sentence of life imprisonment.